## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| RASUL FREELAIN, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 17-CV-6592 |
| | ) | |
| v. | ) | |
| | ) | |
| VILLAGE OF OAK PARK; | ) | JURY TRIAL DEMANDED |
| CHIEF OF POLICE ANTHONY AMBROSE; | ) | |
| and UNKNOWN VILLAGE OFFICIALS AND | ) | |
| POLICE DEPARTMENT COMMAND STAFF | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Rasul Freelain, by his undersigned attorneys, respectfully submits this Complaint against Defendants Village of Oak Park, Oak Park Chief of Police Anthony Ambrose, and Unknown Village Officials and Police Department Command Staff:

## INTRODUCTION

1. The Village of Oak Park and Chief of Police Anthony Ambrose terminated Plaintiff after 15 years as an Oak Park Police Officer because he reported misconduct within the Oak Park Police Department and spoke out about matters of public concern regarding the Oak Park Police command staff. Plaintiff's termination was the result of a culture of retaliation that was not only tolerated by the Village, but also directly enforced by the highest levels of its Police Department. The Village's deliberate indifference to this culture allowed its Chief of Police to believe that he could act with impunity in terminating Plaintiff based on false, absurd charges that were raised for the first time years after the fact, including the charge that Plaintiff committed a fireable offense by reading his own police reports at work. Plaintiff brings this action to remedy the Village's widespread retaliatory practices under Title VII of the Civil Rights Act of 1964 as

amended, 42 U.S.C. § 2000e *et seq.*; the Illinois Whistleblower Act, 740 ILCS 174/1 *et seq.*; the Civil Rights Act of 1871, 42 U.S.C. § 1983; the Family And Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*; and the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

## PARTIES

2.      Plaintiff Rasul Freelain is a resident of Cook County, Illinois.

3.      Defendant Village of Oak Park is a municipality in Cook County, Illinois that employed Plaintiff as a patrol officer and detective from approximately May 6, 2002 to May 26, 2017.

4.      Defendant Anthony Ambrose is the Oak Park Chief of Police and a resident of Cook County, Illinois.

5.      Unknown Village Officials and Police Department Command Staff are members of the Village administration and command staff that conspired with Chief Ambrose to terminate Plaintiff in retaliation for his protected activity.

## JURISDICTION & VENUE

6.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, as Plaintiff's claims arise under 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1983, 29 U.S.C. § 2601 *et seq.*, and 42 U.S.C. § 12101 *et seq.*  The Court has jurisdiction over Plaintiff's Illinois Whistleblower Act claim pursuant to 28 U.S.C. § 1367.

7.      This District is an appropriate venue under 28 U.S.C. § 1391, as the Village is a municipality in this District, Chief Ambrose resides in this District, and the events or omissions giving rise to Plaintiff's claims arose in this District.

## BACKGROUND

8.     Plaintiff joined the Oak Park Police Department in 2002, maintaining an exemplary record as both a patrol officer and detective during his 15 years as a Village employee.  The Village terminated Plaintiff in May 2017 because he showed the courage to report an Oak Park Police Sergeant for sexual harassment and battery, and speak out about the culture of retaliation that the Village and the Oak Park Police command staff use to silence employees.

### Plaintiff Reports A Pattern Of Sexual Harassment Within The Oak Park Police Department

9.     While Plaintiff served in the Oak Park Police Department, Sergeant Dina Vardal routinely and openly pressured male officers to have sex with her, often interrupting officers handling police matters with unwanted sexual advances.

10.     Sergeant Vardal's sexual misconduct was common knowledge throughout the Department for many years, and frequently the topic of lament amongst the rank and file that was subjected to her harassment.

11.     But Officers were afraid to report Vardal's misconduct, because they feared retaliation from Vardal and the command staff.

12.     The command staff protected Vardal from discipline.  On one occasion, Vardal informed Plaintiff that she called then Deputy Chief Anthony Ambrose in relation to a putative investigation against her because she "had to let Ambrose know what was going on."

13.     Vardal's inappropriate sexual overtures towards Plaintiff began in 2007 while Plaintiff was working as a detective in the Juvenile Investigations Division, and continued despite Plaintiff repeatedly informing Vardal that he was a married man.

3

14.     When Plaintiff rejected Vardal's advances, Vardal retaliated in arbitrary fashion, including by rejecting Plaintiff's arrest reports for stylistic reasons such as Plaintiff's capitalization of the word "Hours."

15.     In April 2012, Vardal informed Plaintiff that she had just reviewed video of Plaintiff performing a field sobriety test and thought the way he administered the test was "cute." Vardal later approached Plaintiff in the garage underneath the police station, and told Plaintiff that she wanted to give Plaintiff "one on one training" on field sobriety tests "on her own personal time."

16.     Although he knew that retaliation would likely ensue, Plaintiff made the difficult decision to report Sergeant Vardal's pattern of sexual harassment against him and other officers to Oak Park Human Resources on May 9 and May 10, 2012.

17.     Plaintiff had never made a complaint against an officer or supervisor previously.

18.     Plaintiff's May 10, 2012 letter to Human Resources explained why he felt compelled to report:

> For too long I have been afraid to bring to light [Vardal's] pattern of behavior, for fear of retaliation.  However, it is clear that regardless of the fallout that may result from this report, I must tell the truth.  I owe this to myself, my family, fellow Officers and the Village of Oak Park…. It is my hope that this matter will be investigated fairly and thoroughly, and that the truth will come to light.  If I face anger and ridicule from supervisors (or even fellow Officers who are embarrassed their names were brought into this investigation), I will just have to face that.  I am tired of being afraid, as so many other Officers have been, to simply tell the truth.  I can no longer sit in silence.

19.     The Village hired an outside firm to investigate Vardal's sexual harassment of Plaintiff, but chose to ignore Plaintiff's report of a pattern of sexual harassment against multiple other officers over the course of a decade.

4

20. The Village's investigation ended in early June 2012 without any formal findings or interviews of anyone other than Plaintiff.

21. The results of the investigation were not disclosed to Plaintiff until nearly four months later in September 2012 when the Village told Plaintiff that Vardal had been exonerated.

22. The Village's basis for exonerating Vardal was remarkably disingenuous. The Village was forced to admit that "the incidents occurred as described in [Plaintiff's] complaint," but claimed that "none of [the incidents described by Plaintiff] were improper or unlawful." For instance, the Village spun Vardal's remarks regarding field sobriety testing as merely an example of the Sergeant "communicating clearly identified operational concerns."

23. Plaintiff's letter to Human Resources unfortunately had not led the Village to conduct a fair and thorough investigation. The letter only foreshadowed the blatant retaliation that was to come.

### *Plaintiff Reports Vardal's Battery*

24. On Saturday, May 19, 2012, ten days after reporting Vardal to Human Resources, Plaintiff was on duty investigating a suspicious auto along with Oak Park Police Sergeant John Curtain.

25. Vardal surprised Plaintiff at the scene, shoving him against his squad car and telling him to "look out! look out!"

26. Sergeant Curtain indicated that Plaintiff should report the incident, because "this is getting out of hand."

27. Plaintiff reported Vardal's battery to Human Resources on Monday May 21, 2012, and followed with letters documenting the incident.

28.     Plaintiff's letters to Human Resources reported that Vardal had committed felony and misdemeanor battery.

29.     Then Deputy Chief Ambrose took control of the battery investigation.

30.     Seven months later, Chief of Police Rick Tanksley issued a three-day suspension to Sergeant Vardal.  Chief Tanksley then agreed with Sergeant Vardal to reduce the suspension to one day.

31.     During the course of the battery investigation, Plaintiff asked to sign a criminal battery complaint Vardal.

32.     Plaintiff was denied the right to sign a complaint against Vardal.

33.     Concerned that the Village would cover up Vardal's misconduct, Plaintiff reported Vardal's battery to the Cook County State's Attorney in November 2012 and May 2013.

34.     After learning that Plaintiff reported Vardal's battery to the State's Attorney, Chief Tanksely wrote in a memo that Plaintiff "should be advised that he is to have no further contact with the State's Attorney's Office or he will place himself at risk of being disciplined."

### Plaintiff Files Suit After The Village Places Him On Seven Weeks Of Unpaid Leave

35.     Plaintiff and his family suffered as a result of Sergeant Vardal and the Village's response to her misconduct.   Plaintiff experienced stress, difficulty sleeping, and chronic headaches.

36.     In August and September 2012, Plaintiff took approximately three weeks of leave to cope with severe headaches and stress related to Sergeant's Vardal's continued presence at work.

6

37.     When Plaintiff notified the Village that he required leave, he spoke with a Sergeant. Plaintiff told the Sergeant that he was experiencing migraine headaches and stress and felt unsafe at work due to Vardal.

38.     The Sergeant felt compelled to immediately send a memo to Deputy Chief Ambrose assuring the Deputy Chief that "I told [Plaintiff] I do not know anything about his complaint and nor do I want to know anything about it."

39.     The Village refused to classify Plaintiff's headaches and stress as work-related, which caused Plaintiff to lose a significant amount of accrued sick time.

40.     On the day Plaintiff returned from leave, Chief Tanksley scheduled a personal meeting with Plaintiff.  After sitting on the results of the Village's investigation for nearly four months, Chief Tanksley took this opportunity to inform Plaintiff that the Village exonerated Sergeant Vardal of Plaintiff's sexual harassment complaint.

41.     During the meeting, Chief Tanksley also claimed that Plaintiff's report of headaches and stress related to Sergeant Vardal made Chief Tanksley concerned about Plaintiff's fitness for duty.

42.     Chief Tanksley ordered Plaintiff to undergo a psychological fitness-for-duty evaluation.

43.     The Village ordered an in-depth psychological evaluation to assess Plaintiff's "dangerousness."

44.     The evaluation was dragged out for seven weeks, after which the Village doctor informed the Village of the obvious fact that Plaintiff was not dangerous and was fit for duty.

45.     During the seven-week evaluation, the Village placed Plaintiff on unpaid leave, depleting all of his remaining sick time and forcing him into a no-pay situation.

46.    The Village did not credit Plaintiff for the seven weeks of mandatory leave until several months later.

47.    Based on the Village's actions in 2012 and 2013, Plaintiff filed an EEOC charge for sexual harassment, ADA discrimination, and retaliation on April 3, 2013.

48.    Plaintiff subsequently filed a lawsuit against the Village for FMLA interference and retaliation and ADA discrimination and retaliation, and against Sergeant Vardal for assault and battery and violation of the Illinois Gender Violence Act.

49.    Plaintiff's lawsuit was captioned *Freelain v. Village of Oak Park*, *et al.*, Case No. 13-cv-3682.

50.    On November 3, 2016, the court entered summary judgment in favor of the Village in Plaintiff's suit, in part based on its determination that the Village had not taken adverse action against Plaintiff.

51.    The court's summary judgment ruling is currently on appeal before the Seventh Circuit Court of Appeals.

### *Plaintiff's Lawsuit Exposes The Command Staff*

52.    Plaintiff's lawsuit exposed a range of misconduct in the Oak Park Police Department, and garnered significant attention in the local press.

53.    Plaintiff spoke out about a number of topics related to sexual harassment, retaliation, employment discrimination, and the Oak Park Police command staff.

54.    While testifying at his 2015 deposition, Plaintiff spoke out about his effort to notify the command staff that Oak Park resident Sheila von Weise-Mack feared she would be murdered by her daughter.

55.    Plaintiff was one of the officers that investigated the Mack case in Oak Park.

56.     Plaintiff took appropriate law enforcement action and made appropriate referrals in response to the case.

57.     Plaintiff testified during his deposition that he attempted to notify Chief Tanksley in early 2013 that von Weise-Mack feared she would be murdered, but was instructed not to do so because Chief Tanksley was "tired" of Plaintiff and "[didn't] want to hear" from him.

58.     Plaintiff testified that he then submitted a memo documenting Mack's fear to Deputy Chief Ambrose.

59.     The Mack case gained widespread media attention when von Weise-Mack was murdered by her daughter in August 2014.

60.     Plaintiff's testimony raised questions regarding the Department's use of resources to help protect von Weise-Mack from her daughter prior to her murder.

61.     Plaintiff's testimony was reported on in the *Wednesday Journal of Oak Park and River Forest* in a June 2015 article entitled "Police brass knew Sheila Mack feared daughter would murder her."

62.     The Village retaliated against Plaintiff for this testimony by citing Plaintiff's review of his own police reports in the Mack case as a reason for his termination.

63.     During the lawsuit, Plaintiff also exposed Tanksley, Ambrose, Vardal, and the Village for misrepresenting the discipline Vardal received for her battery of Plaintiff.

64.     In court filings, Plaintiff revealed the inconsistency between Tanksley, Ambrose, and Vardal swearing under oath that Vardal received a three-day suspension and the actual fact that Tanksely and Vardal agreed to reduce the suspension to one day.

65.     Plaintiff also called the Village out for failing to produce an accurate copy of Vardal's disciplinary history and instead producing a copy that reflected a three-day suspension.

9

66. These revelations were reported on in articles in the *Wednesday Journal*.

67. The Village retaliated against Plaintiff for making these revelations by inventing demonstrably false, absurd charges of untruthful testimony against Plaintiff, as explained below.

### *The Village Initiates Two Retaliatory Investigations Against Plaintiff*

68. On June 28, 2016, Chief Tanksley issued a notice of investigation to Plaintiff regarding an arrest that took place over two and a half years earlier on November 21, 2013.

69. In the over two and a half years before Chief Tanksley's notice of investigation, the Village never disciplined Plaintiff, never opened an investigation, and never so much as hinted that Plaintiff did anything wrong in relation to the arrest.

70. On the day of the arrest, Plaintiff responded to a domestic violence call at the apartment of Darren Durden along with Oak Park Police Officers Donaire and Valentine. Durden's girlfriend reported that Durden struck her.

71. Plaintiff escorted the victim out of the apartment, and noticed a welt on the victim's arm. Plaintiff believed the welt supported the victim's statement that Durden struck her, and gave him probable cause to arrest Durden for domestic battery.

72. After Plaintiff escorted the victim out of the apartment, Durden rushed outside and started screaming at the victim. Durden repeatedly ignored Plaintiff's orders to stay back.

73. Despite Plaintiff's repeated commands to stay back, Durden kept approaching the victim and made contact with Plaintiff's outstretched arm as Plaintiff attempted to keep Durden away from the victim.

74. When Durden made contact, Plaintiff grabbed Durden's arm but Durden pulled away. Plaintiff then took Durden to the ground, and handcuffed him.

75.     At this point, Plaintiff believed that he had probable cause to arrest Durden for resisting arrest in addition to domestic battery.

76.     Durden suffered no injury as a result of the arrest other than an abrasion on his knee and possibly his shoulder.

77.     When Plaintiff asked the Watch Commander whether he needed to complete a use of force report in relation to the arrest, the Watch Commander instructed Plaintiff that a use of force report was not necessary.

78.     On October 24, 2014, Durden filed a lawsuit against the Village and Plaintiff alleging excessive force and malicious prosecution.

79.     The Village defended Plaintiff in the suit, and made no attempt to settle prior to trial.

80.     The Village did not open an investigation in response to Durden's lawsuit.

81.     While the jury ultimately returned a verdict for Durden, the circumstances of Durden's arrest did not justify the Village's pursuit of discipline over two and a half years after the fact.

82.     The Village itself told the jury that Plaintiff "acted responsibly," "acted with patience," "acted with restraint," and "gathered facts before jumping to conclusions."

83.     The Village further explained that Plaintiff "used that amount of force necessary to stop Mr. Durden from getting past him to [the victim]," and that Durden's minimal injuries were indicative of the minimal amount of force used.

84.     The trial judge would not let the jury even consider awarding punitive damages – which is rare for a judge to do in a case alleging excessive force and malicious prosecution –

because Durden could not establish that Officer Freelain acted with malice or reckless disregard for Durden's rights.

85.     Nevertheless, Chief Tanksely's notice of investigation alleged that Plaintiff's use of force violated Department General Orders.

86.     The notice of investigation also alleged that Plaintiff violated General Orders by not submitting a use of force report, although the Watch Commander had specifically instructed Plaintiff not to submit a use of force report.

87.     In addition, the notice of investigation alleged that Plaintiff testified untruthfully in the Durden trial.  The notice of investigation erroneously claimed that "you testified regarding the existence of a state statute that explains certain injuries are acceptable during instances of resisting arrest.  No such statute exists."

88.     This allegation is especially interesting because Plaintiff never gave any such testimony and the allegation surfaced for the first time in Chief Tanksley's notice of investigation.

89.     The allegation of untruthful testimony was made in retaliation for Plaintiff exposing inconsistencies in Tanksley, Ambrose, and Vardal's testimony in Plaintiff's lawsuit against the Village.

90.      Plaintiff was interrogated regarding these allegations on July 21, 2016.

91.     Apparently unhappy with the results of the interrogation, the Village issued a second notice of investigation on August 8, 2016 with a new set of allegations against Plaintiff.

92.     The second notice of investigation vaguely alleged that Plaintiff accessed a criminal history database without authorization.

93.     The notice of investigation did not provide further detail, such as when Plaintiff allegedly accessed the database, or how the Village determined that Plaintiff accessed the database.

12

94.     Plaintiff was interrogated regarding these allegations on August 17, 2016.

95.     After his second interrogation, Plaintiff did not hear anything from the Village until November 21, 2016.

96.     The Village's extended silence showed deliberate disregard for the Collective Bargaining Agreement, which required the Village to notify Plaintiff of the results of the investigations within 30 days or else update Plaintiff with the status of the investigation after 30 days and every 14 days thereafter.

### The Village Denies Plaintiff Basic Due Process

97.     On November 3, 2016, the court entered summary judgment in favor of the Village in Plaintiff's lawsuit, agreeing with the Village's argument that it had not taken adverse action against Plaintiff.

98.     The Village took just 18 days after the ruling to break its silence and issue the findings of its investigations against Plaintiff.

99.     In a November 21, 2016 letter, now Chief Ambrose notified Plaintiff that the Village's investigations had concluded and that he had made a number of findings.

100.     Chief Ambrose's findings flouted even the most basic due process and common sense.

101.     A number of new charges were raised in Chief Ambrose's letter that Plaintiff had never been notified of previously.

102.     Chief Ambrose invented a new charge of untruthful testimony, claiming for the first time that Plaintiff's testimony in Durden's criminal case in June 2014 was inconsistent with his testimony in Durden's civil trial in June 2016.  Chief Ambrose also claimed for the first time that

Plaintiff's testimony was inconsistent with Plaintiff's written and verbal accounts of the Durden incident.

103.    Chief Ambrose could not explain what was inconsistent about Plaintiff's testimony. But that did not stop Chief Ambrose from threatening to report Plaintiff to the State's Attorney for allegedly committing a *Brady* violation.

104.    This was just the latest iteration of the Village retaliating against Plaintiff for exposing inconsistencies in Tanksley, Ambrose, and Vardal's testimony in Plaintiff's lawsuit.

105.    Chief Ambrose's letter claimed for the first time that Plaintiff failed to secure evidence during the Durden incident.  Chief Ambrose did not explain what evidence Plaintiff allegedly failed to secure.

106.    Chief Ambrose claimed for the first time that Plaintiff failed to *document* the offer of medical treatment to Durden's victim and failed to *document* notification to the victim of her rights under the Illinois Domestic Violence Act (IDVA).

107.    No Department General Order, Rule, or Regulation requires an officer to *document* his offer of medical care or IDVA notice to a victim.  Chief Ambrose invented these rules to discipline Plaintiff.

108.    Chief Ambrose also disregarded the fact that Plaintiff did document in his arrest reports that he offered medical care to the victim and she declined.

109.    Nor were any other officers that responded to the Durden call investigated or disciplined for their paperwork on the case.

110.    Chief Ambrose also didn't forget to punish Plaintiff for testifying about the Mack case.

111.    In one of the best telegraphed cases of retaliation of all time, Chief Ambrose informed Plaintiff that he would be subject to discipline for reviewing his own police reports in the Mack case in the I-CLEAR database on the day over two years earlier that Plaintiff learned Sheila von Weise-Mack was murdered.

112.    Chief Ambrose claimed that Plaintiff – a police officer who was assigned to investigate the Mack case and reported Sheila von Weise-Mack's fear that her daughter would murder her – did not have authorization to review his own police reports regarding the case in I-CLEAR when the victim was murdered.

113.    Chief Ambrose couldn't explain why he first decided to pursue discipline for Plaintiff's review of his own police reports more than two years after the fact.

114.    In similar fashion, Chief Ambrose notified Plaintiff that he would be subject to discipline for reviewing his own police reports regarding Darren Durden in the I-CLEAR database in preparation for testifying in Durden's civil trial.

115.    Plaintiff reviewed the reports because the Village attorneys defending the Durden suit instructed Plaintiff to review his reports in preparation for his testimony.

116.    Chief Ambrose again had no explanation for why he waited to pursue discipline against Plaintiff for reviewing his own police reports.

117.    Plaintiff's review of his police reports was entirely consistent with Department policy and practice.

118.    Oak Park Police Officers use I-CLEAR on a daily basis to review their own reports as well as the reports of other officers.

119.    In fact, the Village trained Plaintiff to review police reports in I-CLEAR.

120. Upon information and belief, someone in the Village administration accessed I-CLEAR themselves to search Plaintiff's history of I-CLEAR queries.

121. This was the illegitimate use of I-CLEAR at issue in this case, as Plaintiff's I-CLEAR history was searched for the sole purpose of inventing pretext for his termination.

122. Notably absent from Chief Ambrose's letter was any claim that Plaintiff used inappropriate force against Darren Durden.

123. Chief Ambrose held a so-called "Due Process Pre-Disciplinary Interview" with Plaintiff in December 2016.

124. During the meeting, Ambrose refused to answer any questions or explain the evidence he believed supported his charges against Plaintiff.

125. Ambrose refused to explain what he believed was inconsistent about Plaintiff's testimony.

126. Ambrose refused to explain what evidence Plaintiff allegedly failed to secure during the Durden incident.

127. Ambrose would not identify any witnesses against Plaintiff or the person(s) making the allegations against Plaintiff, which was particularly troubling given that the charges against Plaintiff were raised so long after the fact.

128. Plaintiff was left in the dark and unable to adequately respond to Ambrose's unexplained charges.

### The Village Terminates Plaintiff Based On
### Ever-Shifting Proffered Justifications

129. On May 26, 2017, Chief Ambrose issued a letter terminating Plaintiff from employment with the Village.

130. Once again, Chief Ambrose provided an entirely new set of justifications.

131.    Chief Ambrose relied on the jury's finding of excessive force in the Durden case, despite omitting any mention of excessive force in his previous findings after the conclusion of the investigations.

132.    Chief Ambrose claimed for the first time that Plaintiff was at fault for Officer Donaire leaving the scene prior to Durden rushing out of his apartment.  Chief Ambrose claimed that Plaintiff should have anticipated Durden rushing out of his building and had Officer Donaire remain to assist with Durden's future arrest.  Plaintiff was not a supervisor and had no authority to order Officer Donaire to remain on scene.

133.    Alternatively, Chief Ambrose claimed, Plaintiff should have called and waited for a unit to assist while Durden rushed towards the victim.  Chief Ambrose ignored the fact that Plaintiff did repeatedly call for an assisting unit on the radio prior to Durden's arrest.

134.    Chief Ambrose relied for the first time on the jury's finding of malicious prosecution, which Chief Ambrose dubbed "illegal arrest."  Chief Ambrose claimed for the first time that the jury's finding "comprises your credibility in your arrests and potential testimony related thereto moving forward," yet again searching for any way to accuse Plaintiff of untruthfulness.

135.    Chief Ambrose claimed for the first time that Plaintiff "bypassed the proper procedure when filing additional charges for resisting arrest against Durden."  Ambrose – the Chief of Police – seemed to have difficulty understanding that it was the State's Attorney that charged Durden and the State's Attorney that asked Plaintiff to sign a criminal complaint against Durden for resisting arrest.

136.    Chief Ambrose claimed that "even if" it was the case that "the State's Attorney requested that you file these charges…you never notified the Department that this charge was

17

added." Chie Ambrose failed to cite any Department General Order, Rule, or Regulation that requires an officer to notify the Department of the State's Attorney's charging decisions.

137.    Chief Ambrose claimed for the first time that Plaintiff failed to secure a cane Durden used to hit the victim, and did not request an evidence technician to photograph the scene. Chief Ambrose's conclusion again disregarded the facts in retaliatory fashion. Plaintiff did call for an evidence technician on the radio, and the other officers that responded to the Durden call were not investigated or disciplined in relation to any alleged failure to secure or photograph evidence.

138.    Chief Ambrose repeated his erroneous finding that Plaintiff failed to document the offer of medical care and IDVA notification. No Department General Order, Rule, or Regulation required such documentation. In any event, Plaintiff documented that he offered medical care to the victim in his arrest reports.

139.    Chief Ambrose explained for the first time what he claimed were inconsistencies in Plaintiff's testimony, and his explanation was patently absurd. Chief Ambrose claimed that Plaintiff was untruthful because: (1) Plaintiff testified in Durden's criminal trial in June 2014 that he decided to arrest Durden for resisting arrest when Durden made contact with his arm; and (2) Plaintiff testified in Durden's civil trial two years later that he decided to arrest Durden for domestic battery before Durden made contact with his arm.

140.    Obviously, there was nothing inconsistent or untruthful about Plaintiff's testimony. Plaintiff believed that he had probable cause for domestic battery before he believed that he had probable cause for resisting arrest.

141.    The absurdity continued with Chief Ambrose informing Plaintiff that he was being fired for reading his own police reports in the Mack and Durden cases, and that "[t]he delay in

18

discipline for these violations was the result of awaiting the outcome of pending legal proceedings."

142.    Chief Ambrose did not specify the legal proceedings he was awaiting to terminate Plaintiff.

143.    Chief Ambrose later claimed that he was awaiting the Durden lawsuit.

144.    But the Durden lawsuit had not been filed when Plaintiff reviewed his reports in this Mack case after Sheila von Weise-Mack was murdered in August 2014.

145.    The only relevant legal proceeding pending at the time was Plaintiff's lawsuit against the Village.

146.    Nor would Plaintiff reviewing his own police reports somehow have provided fodder for Durden in his lawsuit.

147.    Chief Ambrose has no good explanation for terminating Plaintiff based on charges raised for the first time years after the fact.

148.    Chief Ambrose's termination letter also dug into the "Job Description for the position of Police Officer" as well as the Oak Park Personnel Manual, neither of which had been mentioned before as a potential basis for discipline.

149.    Plaintiff filed an EEOC charge based on his termination on June 14, 2017, and received notice of his right to sue on June 15, 2017.

150.    Chief Ambrose held a post-termination meeting with Plaintiff on July 14, 2017.

151.    The Village used the meeting to cross-examine Plaintiff rather than consider Plaintiff's response to Chief Ambrose's charges.

152.    After the meeting, Chief Ambrose issued yet another letter explaining his reasons for terminating Plaintiff.

153.    The letter didn't miss the opportunity to invent new justifications for Plaintiff's termination, including that Plaintiff not completing a use of force report after the Durden arrest (as instructed by the Watch Commander) was "equivalent to making an untruthful statement or report."

154.    Chief Ambrose looked for ways to accuse Plaintiff of untruthfulness at every turn.

155.    Chief Ambrose's letter also misrepresented Plaintiff's response to the charges at the post-termination meeting as part of his continuing effort to manufacture support for his baseless charges.

156.    Village Manager Cara Pavlicek held a post-termination meeting with Plaintiff on August 24, 2016.

157.    The Village again used the meeting as a vehicle for cross-examination and refused to answer questions.

158.    The Village has yet to fairly consider the facts of this case or Plaintiff's response to Chief Ambrose's charges.

## COUNT I – TITLE VII RETALIATION
### (Against The Village)

159.    Plaintiff re-alleges and reincorporates paragraphs 1 through 158 above.

160.    The Village terminated Plaintiff in retaliation for engaging in activity protected under Title VII (42 U.S.C. § 2000e *et seq.*), including filing an EEOC charge and reporting and opposing Sergeant's Vardal's sexual harassment of Plaintiff.

161.    Plaintiff's has suffered significant damages as a result, including lost salary of over $90,000 per year plus benefits, severe emotional distress, and damage to his reputation that has made it virtually impossible to continue his career in law enforcement.

## COUNT II – ILLINOIS WHISTLEBLOWER ACT
### (Against The Village)

162.    Plaintiff re-alleges and reincorporates paragraphs 1 through 161 above.

163.    The Village violated the Illinois Whistleblower Act (740 ILCS 174/15) by terminating Plaintiff in retaliation for reporting violations of state and federal law, including Sergeant Vardal's broader pattern of sexual harassment within the Oak Park Police Department and Sergeant Vardal's battery against Plaintiff.

164.    The Village also violated 740 ILCS 174/20-20.2 by threatening to report Plaintiff to the State's Attorney for a purported *Brady* violation, and then following through on that threat.

165.    Plaintiff has suffered significant damages as a result, including lost salary of over $90,000 per year plus benefits, severe emotional distress, and damage to his reputation.

## COUNT III – FIRST AMENDMENT RETALIATION
### (Against Chief Of Police Anthony Ambrose)

166.    Plaintiff re-alleges and reincorporates paragraphs 1 through 165 above.

167.    Plaintiff spoke out on matters of public concern in his lawsuit against the Village, including his efforts to notify the Oak Park Police command staff that Sheila von Weise-Mack feared she would be murdered by her daughter.

168.    Chief Ambrose is liable under 42 U.S.C. § 1983 for terminating Plaintiff in retaliation for his First-Amendment protected speech, including Plaintiff's testimony regarding the Mack case.

169.    Plaintiff has suffered significant damages as a result, including lost salary of over $90,000 per year plus benefits, severe emotional distress, and damage to his reputation.

170.    Chief Ambrose acted willfully and with deliberate disregard for Plaintiff's First Amendment rights, which renders him liable for punitive damages.

## COUNT IV - VIOLATION OF DUE PROCESS
### (Against Chief Of Police Anthony Ambrose)

171.    Plaintiff re-alleges and reincorporates paragraphs 1 through 170 above.

172.    Plaintiff maintained a property interest in continued employment with the Village, because the Collective Bargaining Agreement prohibited the Village from terminating Plaintiff without just cause.

173.    The Due Process Clause of the Fourteenth Amendment protects Plaintiff's interest in continued employment.

174.    Chief Ambrose is liable under 42 U.S.C. § 1983 for committing textbook due process violations, including relying on new charges in his termination letter without affording Plaintiff an opportunity to respond, refusing to explain the evidence that allegedly supported the charges against Plaintiff, deliberately misinterpreting and inventing new Department Rules and General Orders to terminate Plaintiff, pre-determining that Plaintiff would be terminated regardless of the facts, misrepresenting the facts to support his baseless charges, and refusing to act as an impartial decision-maker.

175.    Plaintiff has suffered significant damages as a result, including lost salary of over $90,000 per year plus benefits, severe emotional distress, and damage to his reputation.

176.    Chief Ambrose acted willfully and with deliberate disregard for Plaintiff's due process rights, which renders him liable for punitive damages.

## COUNT V – CONSPIRACY
### (Against Unknown Village Officials And Police Department Command Staff)

177.    Plaintiff re-alleges and reincorporates paragraphs 1 through 176 above.

178.     Unknown Village Officials and Police Department Command Staff are liable under 42 U.S.C. § 1983, because they agreed and conspired with Chief Ambrose to retaliate against Plaintiff and terminate Plaintiff in violation of the First Amendment and Due Process Clause.

179.     Unknown Village Officials and Police Department Command Staff took actions to further the conspiracy, including by inventing retaliatory charges against Plaintiff; reviewing transcripts of Plaintiff's testimony and Plaintiff's history of I-CLEAR queries, and otherwise searching for pretext to fire Plaintiff; covering up evidence of retaliation; and facilitating, approving, and/or turning a blind eye to Chief Ambrose's retaliatory conduct.

180.     In doing so, Unknown Village Officials and Police Department Command Staff were motivated solely by personal bias and were acting as part of a broader pattern of retaliation against Plaintiff and other employees that spoke out on matters of public concern.

181.     Plaintiff has suffered significant damages as a result, including lost salary of over $90,000 per year plus benefits, severe emotional distress, and damage to his reputation.

182.     Unknown Village Officials and Police Department Command Staff acted willfully and with deliberate disregard for Plaintiff's constitutional rights, which renders them liable for punitive damages.

## COUNT VI – INDEMNIFICATION
### (Against The Village)

183.     Plaintiff re-alleges and reincorporates paragraphs 1 through 182 above.

184.     Chief Ambrose and Unknown Village Officials and Police Department Command Staff are liable for violating Plaintiff's First Amendment and due process rights.

185.     Pursuant to 745 ILCS 10/9-102, the Village must indemnify any judgment against Chief Ambrose and Unknown Village Officials and Police Department Command Staff.

## COUNT VII – FMLA RETALIATION
### (Against The Village)

186.    Plaintiff re-alleges and reincorporates paragraphs 1 through 185 above.

187.    The Village terminated Plaintiff in retaliation for protected activity under the FMLA (29 U.S.C. § 2601 *et seq.*), including taking leave related to Sergeant Vardal and bringing a lawsuit against the Village that asserted violations of the FMLA.

188.    Plaintiff has suffered significant damages as a result, including lost salary of over $90,000 per year plus benefits, severe emotional distress, and damage to his reputation.

## COUNT VIII – ADA RETALIATION
### (Against The Village)

189.    Plaintiff re-alleges and reincorporates paragraphs 1 through 188 above.

190.    The Village terminated Plaintiff in retaliation for protected activity under the ADA (42 U.S.C. § 12101 *et seq.*), including filing an EEOC charge and bringing a lawsuit against the Village that asserted violations of the ADA.

191.    Plaintiff has suffered significant damages as a result, including lost salary of over $90,000 per year plus benefits, severe emotional distress, and damage to his reputation.

## COUNT IX – *MONELL*
### (Against The Village)

192.    Plaintiff re-alleges and reincorporates paragraphs 1 through 191 above.

193.    The Village is liable under 42 U.S.C. § 1983, because the Village and Oak Park Police command staff maintained at all relevant times a widespread practice of retaliating and/or pursuing arbitrary discipline against employees who spoke out regarding misconduct or other matters of public concern.

194.    This pattern of retaliation was so prevalent as to constitute an official Village policy.

24

195.    The Village remained deliberately indifferent to this policy, allowing Village officials like Chief Ambrose to violate employees' First Amendment and due process rights with impunity.

196.    The Village and Oak Park Police command staff's policy of retaliation was the moving force behind Plaintiff's unlawful termination.

197.    The Village is also liable under 42 U.S.C. § 1983, because Plaintiff's termination was devised, approved, and carried out by individuals with final policymaking authority, including Chief Ambrose.

198.    Plaintiff has suffered significant damages as a result of his unlawful termination, including lost salary of over $90,000 per year plus benefits, severe emotional distress, and damage to his reputation.

**WHEREFORE,** Plaintiff respectfully requests judgment in his favor and against Defendants, and for all available relief, including:

(1)    backpay and lost benefits;

(2)    reinstatement or lost future earnings and income;

(3)    compensatory damages, including for emotional distress and damage to reputation;

(4)    punitive damages against Chief Ambrose;

(5)    liquidated damages under the FMLA;

(6)    appropriate injunctive relief, including an injunction prohibiting the Village from retaliating against Plaintiff and other employees for protected activity, and ordering expungement of retaliatory charges and discipline from Plaintiff's personnel file;

(7)    a monitor to supervise working conditions within the Oak Park Police Department for a period of at least five years;

(8)     attorney fees, expert witness fees, expenses, and costs;

(9)     pre and post-judgment interest; and

(10)    such other and further relief that the Court deems just.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED:  September 12, 2017                    Respectfully submitted,

                                             By: /s/ Marko Duric

                                             Robert Robertson
                                             Marko Duric
                                             ROBERTSON DURIC
                                             One North LaSalle, Suite 300
                                             Chicago, IL 60602
                                             (708) 334-8699
                                             (224) 567-2997